Vrotney Unemployment Compensation Case.
Erie Forge and Steel Corporation, Appellant,
*v.* Unemployment Compensation Board
of Review.

Argued November 14, 1957.   Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John E. Britton,* with him *Henry A. McDonald,* and *Gifford, Graham, MacDonald & Illig,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for appellee.

*James G. Hanes,* for intervenors.

OPINION BY WOODSIDE, J., December 12, 1958:

This is an appeal by the Erie Forge and Steel Corporation from the decision of the Unemployment Compensation Board of Review allowing compensation to the corporation's employes.   The bureau denied the claimant, Henry Vrotney, compensation on the ground that he was out of employment because he was striking, but the referee and the board concluded that the work stoppage was a lockout, and allowed compensation to the claimant and his fellow employes.   Six appeals were taken to this Court by the employer.   The decision in this case not only rules all six appeals, but also over a thousand other claims in which the relevant facts and law are identical with this case.

The claimants were members of the United Steelworkers of America, C.I.O.   The union had a contract with the employer which expired at midnight August 31, 1954.   On June 23, 1954, the union notified the

employer company of its desire to negotiate with respect to the terms and conditions of a new contract.

A number of meetings were held between that time and the expiration of the contract. The union asked for a 5¢ per hour wage increase and certain "fringe benefits" pertaining to insurance and pensions which would have totalled approximately 9¢ per hour. The company made no offer on wages and "fringe benefits" until August 26th, when it offered 6¢ per hour increase to be divided between wages and fringe benefits in whatever way the union desired. The increase was, however, "contingent upon the fact that the premium and tonnage system would be abolished." This was an incentive system in which only 30% of the employes shared. Although all of the employes were offered the hourly increase, the evidence shows that some, although not all, of those on incentive pay would have suffered a loss of take-home pay.

August 28th, at a meeting of the union, the company offer was rejected. On Monday, August 30, the union informed the employer of the result of the meeting on the 28th and stated "that if a new contract was not consummated by midnight, August 31, 1954, a strike would take place."

On August 31, Paul Nunes, an officer of the union, had a meeting with the local union committee and between 1:00 and 3:45 o'clock in the afternoon called a company officer on the telephone and requested a meeting to discuss a continuance of the contract. The meeting was held at 7:30 o'clock that evening.

Prior to this time, the employes had been urged by written notice from their union officials to appear at 10 o'clock that evening for picket duty, and the employer, after having been advised shortly before noon on August 30th that a strike was called for the following day at midnight, began to shut down the plant.

The assistant to the president of the plant testified, "We have open hearth furnaces, even big pit furnaces, annealing furnaces, and so forth, and we have very valuable steel that has to be annealed and sometimes it takes from 24 hours to seven days to properly condition the steel so that it isn't all a total waste. We immediately began to prepare the plant for shut down and proceeded up until the time of this meeting and during this meeting . . ."

At the meeting on the evening of August 31st, Nunes "proposed [to the company] that the employes continue working on the basis of the existing agreement for an indefinite period of time with a five day cancellation clause by either party to permit additional time for negotiations. The employer refused to agree to such extension and informed the union that work would be available on the basis of its original offer as outlined (above). The employees refused to accept the company's proposal. The employes continued to work their regular shifts until midnight, August 31st. Those on the 11:00 shift reported at 11:00 and worked until midnight. Operations at the plant did not cease until midnight."[1]

Nunes, the union representative, testified "Without the extension agreement we had nothing to work by, with the termination of the agreement that had been in effect for two years, which was about to expire on midnight, August 31st."

As stated by the referee, "The employer herein continued to hold his plant open and there was work available for the claimant and his fellow employes, but only

---

[1] The quoted part is in the language of the board and constitutes findings 9, 10 and 11. There is no substantial dispute as to the facts. We have taken from the evidence a few facts which were not contained in the findings, but there could be no serious dispute about any of them.

under the new conditions of employment laid down by the employer."

The referee and the board were both of the opinion that the case was governed by the *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 106 A. 2d 652 (1954). In concluding this they did not have the advantage of the analysis of that case made by President Judge RHODES in the *Hughes Unemployment Compensation Case,* 187 Pa. Superior Ct. 252, 262, 263, 269, 144 A. 2d 685 (1958), where we reversed the board after it, relying upon the *Leto* case, granted compensation.

Section 402(d) of the Unemployment Compensation Law, 43 PS §802(d) provides: "An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed."

To sustain claims for benefits it must appear that the employes were "unemployed through no fault of their own." Section 3 of the Law, 43 PS §752. The Unemployment Compensation Fund is not to be used to encourage employes to voluntarily cease work and become unemployed. *Hughes Unemployment Compensation Case,* supra, p. 261. The Unemployment Compensation Law was not intended to promote work stoppage. *Miller v. Unemployment Compensation Board of Review,* 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740 (1943); *Accurti Unemployment Compensation Case,* 187 Pa. Superior Ct. 391, 396, 397, 144 A. 2d 673 (1958).

The claimants here are unemployed due to a stoppage of work which exists because of a labor dispute and are ineligible for compensation unless there was a lockout. Where the employer withholds work from

his employes in order to gain a concession from them the work stoppage is considered a lockout and is compensable. *Byerly Unemployment Compensation Case,* 171 Pa. Superior Ct. 303, 308, 90 A. 2d 322 (1952); *Hughes Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 252, 259, 144 A. 2d 685 (1958).

Although the employes may be justified in a given situation in refusing to work for collective bargaining reasons, the work stoppage may still be a strike for unemployment compensation purposes. *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 563, 83 A. 2d 386 (1951); *Hughes Unemployment Compensation Case,* supra, 259.

As in the *Hughes* case the board here interpreted the *Leto Unemployment Compensation Case,* supra, 176 Pa. Superior Ct. 9, 106 A. 2d 652 (1954), as holding that the maintenance of pre-existing terms and conditions of employment for a reasonable time pending settlement of a labor dispute was the sole and universal rule in work stoppage cases, but as pointed out in the *Hughes* case, p. 263, "not every change instituted by an employer which precipitates a work stoppage creates a situation of compensable unemployment."

The *Leto* case merely holds that it was unreasonable for that employer to refuse to permit work to continue on the same terms and conditions of employment as the expiring contract for a reasonable time to avert a work stoppage. *Hughes Unemployment Compensation Case,* supra, p. 269.

In *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 132 A. 2d 749 (1957), we held, with 3 judges dissenting, that the employer in closing his plant did not have a reasonable ground for believing that a strike was imminent. In the case now before us, the employer was advised that the strike would take place at midnight the following day. At that hour

the employes walked out. Employes had been notified by their union officials that the strike would take place and that they were to appear for picket duty. At or shortly before the hour set by the union for striking, pickets took their place.

". . . where an employer closes his plant in anticipation of a strike, his action must be subjected to the test of reasonableness, that is, whether under the circumstances the anticipated strike was reasonably imminent and impending." *Hughes Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 252, 260, 144 A. 2d 685 (1958).

There was no doubt here that the strike was reasonably imminent and impending and that the action of the employer in bringing about an orderly shutdown was advisable, and necessary to properly protect its property. The employer operated a steel plant. The evidence shows that it takes one to seven days "to properly condition steel that it isn't all a total waste." Here the employes notified the company of their intention to strike at a definite time, and the company closed the plant in an orderly way. Immediately before the time set by the employes for the strike, they offered to go back to work, but only with a five day notice of cancellation. By the time the employer could put the plant into full production, the union could call the employes out on another strike without giving the employer an opportunity to "properly condition all the steel." This was an unreasonable condition.

Regardless of the conditions upon which the employes agreed to continue to work, it is clear that the work stoppage was caused by the employes walking off of their jobs. "The actions of the employer and the employe must be subjected to the test of a reasonable desire to maintain the employment status. If the fault is attributable to only one, the result is either a lockout or

a strike; if the fault is attributable to both, compensation must be denied because the Law was enacted for the benefit of persons 'unemployed through no fault of their own.' " *Hughes Unemployment Compensation Case,* supra, pp. 265, 266.

The employes of Erie Forge and Steel Corporation were not locked out at midnight August 31, 1954. Those working at that time could have continued to work, and those employed on other shifts could have returned to work as soon as the plant was made ready for them. They had no contract and they would not work without a contract—"we had nothing to work by." But this alone does not constitute a lockout. See *Hutchins Unemployment Compensation Case,* 187 Pa. Superior Ct. 109, 144 A. 2d 588 (1958).

The claimants and their fellow employes could have gone to work September 1, 1954 at an increased hourly rate which would have increased the take-home pay of 70% of the employes by 6¢ per hour and which would have increased the hourly rate of the other 30% of the employes, although in some instances (the company said 22½%) it would have decreased the take-home pay, assuming, of course, that the 22½% of the employes would have continued to earn the incentive pay in the future in the same amount they had earned it in the past. The company said that the overall would have meant higher labor cost to it; the union said it would have saved the company money.

In determining the final responsibility for a work stoppage, the justification for the act of the employer which precipitated the strike or the justification for the demands of the employes is generally not considered by the compensation authorities or by this Court. *Leto Unemployment Compensation Case,* supra, 176 Pa. Superior Ct. 9, 15, 106 A. 2d 652 (1954); *Hogan Unemployment Compensation Case,* supra, 169 Pa. Su-

perior Ct. 554, 563, 83 A. 2d 386 (1951); *Hughes Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 252, 259, 144 A. 2d 685 (1958).

Not every change instituted by an employer which precipitates a work stoppage creates a situation of compensable unemployment. Proof of a lockout is not necessarily established by evidence that the employer imposed terms of employment which allegedly compel the employes to work under less favorable conditions than those which the employer was bound to supply under its contractual obligation. *Arbechesky Unemployment Compensation Case,* 174 Pa. Superior Ct. 217, 222, 100 A. 2d 396 (1953). An employer is not required to operate his plant without change in order that he might keep his employes on the job. *Hughes Unemployment Compensation Case,* supra, pp. 263, 264.

"Claimant had a right to refuse the employment, but it does not follow that the change in the nature of the work and the reduction in wages in these circumstances placed claimant in a position whereby he could resign with good cause and thus create a status of unemployment within the preview of the law." *Pusa Unemployment Compensation Case,* 178 Pa. Superior Ct. 348, 352, 115 A. 2d 791 (1955).

The employes of Erie Forge and Steel Corporation could have stayed at work or could have gone back to work in September of 1954 with an increased hourly rate. All the employes would have received an increase in their hourly rate and at least 75% would have had an increase in take-home pay.

As stated by the referee "there was work available", but the claimants through their union, as stated by the board "informed management that a strike would occur at midnight, August 31st, unless an agreement was reached," and strike they did.

Decision reversed.

DISSENTING OPINION BY WRIGHT, J.:

These employes were willing to continue working on the basis of the existing agreement so as to afford additional time to negotiate a new contract. The employer refused to agree to such extension. It was the duty of the compensation authorities to ascertain the final cause of and responsibility for the work stoppage. This controlling question of fact was determined in favor of the employes, and we are not at liberty to set aside the Board's finding in such regard when it is supported by the evidence. I would affirm the decision of the Board upon the authority of *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 132 A. 2d 749.